2004 ME 99

**In the Matter of PRIMARY
ELECTION BALLOT
DISPUTES 2004.**

Supreme Judicial Court of Maine.

July 30, 2004.

496 ■

Panel: SAUFLEY, C.J., and
CLIFFORD, RUDMAN, DANA,
ALEXANDER, CALKINS, and LEVY,
JJ.

**DECISION**

[¶ 1] The Deputy Secretary of State has notified the Clerk of the Supreme Judicial Court that, following the conclusion of the recounts conducted in the Democratic Pri-

maries in House District 137 and Senate District 29, and in the Republican Primary in Senate District 20, there were enough disputed ballots to affect the outcomes of those primary races, and the disputes over those ballots need to be resolved.

[¶ 2] Because of ambiguity in the language of 21–A M.R.S.A. § 737–A(10) (Supp.2003), we invited all parties and the Attorney General to provide briefs on the issue of whether the Supreme Judicial Court has jurisdiction to resolve these ballot disputes, or whether the House of Representatives and the Senate reserved to themselves the authority to resolve disputes of primary elections.

**I. JURISDICTION**

A. Article IV, Part 3, Section 3 of the Maine Constitution

■ [¶ 3] Our Constitution requires that "[e]ach House shall be the judge of the elections and qualifications of its own members." ME. CONST. art. IV, pt. 3, § 3. It is clear from other sections of the Constitution that Article IV, Part 3, Section 3 governs only general elections to the House and the Senate. *See* ME. CONST. art. II, § 4 ("The election of Senators and Representatives shall ·be on the Tuesday following the first Monday of November biennially forever ...."); ME. CONST. art. IV, pt. 1, § 5 ("The Governor shall examine the returned copies of such lists [of votes tallied by the municipal election officials] and 7 days before the first Wednesday of December biennially, shall issue a summons to such persons as shall appear to have been elected ...."); ME. CONST. art. IV, pt. 2, §§ 4, 5 (similar procedure for the Senate). Although general elections are required and provided for by Maine's Constitution, primary elections are not referred to in the Constitution, and are creatures of statute.

[¶ 4] In addition, Article IV, Part 3, Section 3 uses the term "members." Primary elections do not determine Senate and House members, but only determine the nominee of a political party. *See* 21–A M.R.S.A. § 1(32) (1993) ("'Primary election' means the regular election for the election of nominees of a party for the general election."). Moreover, according to the language of Article IV, Part 3, Section 3, it is only the members of the incoming Legislature that have the exclusive authority to judge the elections and qualifications of its own members. ME. CONST. art. IV, pt. 3, § 3; *see also Opinion of the Justices*, 394 A.2d 1168, 1171 (Me.1978); *Opinion of the Justices*, 35 Me. 563, 572 (1854).

[¶ 5] Accordingly, Article IV, Part 3, Section 3 of the Maine Constitution does not vest exclusive authority in the Legislature over legislative primary recount appeals and does not prevent us from assuming jurisdiction over these appeals.

B. Language of Title 21–A M.R.S.A. § 737–A(10)

■ [¶ 6] We look to the language and history of 21–A M.R.S.A. § 737–A(10) to determine whether we have jurisdiction to resolve ballot disputes in primary elections. Section 737–A(10) provides:

> For all elections, except for the Senate and the House of Representatives, if there are enough challenged or disputed ballots to affect the result of an election, the Secretary of State shall forward the ballots and related records for that election to the clerk of the Supreme Judicial Court. The Supreme Judicial Court shall determine the result of the election pursuant to procedures adopted by court rule. The decision of the Supreme Judicial Court is final and must be certified to the Governor by the Chief Justice.
>
> For all elections to the Senate and the House of Representatives, each House shall establish procedures for recount appeals.

In "construing a statute, we seek to give effect to the legislative intent by examining the plain meaning of the statutory language." *Gallant v. Bartash, Inc.*, 2002 ME 4, ¶ 3, 786 A.2d 628, 629 (quotation marks omitted). The phrase "all elections" is not defined in title 21–A. Title 21–A, however, does define "any election." 21–A M.R.S.A. § 1(2) (1993) ("'Any election' means primary and general elections and referenda, whether regular or special."). The phrase "any election" is used once in section 737–A. 21–A M.R.S.A. § 737–A ("A losing candidate in any election who desires a recount . . . ."). Therefore, section 737–A generally applies to primary elections.

[¶ 7] The phrase "any election," however, is not used in section 737–A(10). It can logically be argued that there is no practical distinction between the words "all" and "any." *See* NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE 36 (2d ed. 1978) (defining "all" as "any; any whatever"); *id.* at 62 (defining "any" as "every"). Accordingly, the language of section 737–A(10) that states "For all elections to the Senate and the House of Representatives" could be interpreted to include primary elections.

[¶ 8] Other statutory language, however, leads to a different result. Title 21–A M.R.S.A. § 723(1) (Supp.2003) states that "[i]n a primary election, the person who receives a plurality of the votes cast for nomination to any office, as long as there is at least one vote cast for that office, is *nominated* for that office . . . ." (Emphasis added.) "In any other election, the person who receives a plurality of the votes cast for election to any office, as long as there is at least one vote cast for that office, is

*elected* to that office . . . ." 21–A M.R.S.A. § 723(2) (Supp.2003) (emphasis added). There is a distinction, then, between nominations for an office, which is the function of a primary election, and "elections to [or for] the Senate and the House of Representatives." 21–A M.R.S.A. § 737–A(10); *see also id.* § 723(2). Therefore, we could alternatively interpret the language of section 737–A(10) as allowing the Court to assume jurisdiction over legislative primary recount appeals because primary elections are not "elections to" or "for" an office in the Senate or the House, but are only nominations of a political party to seek election to an office. Because the language of section 737–A(10) is "reasonably susceptible of different interpretations," it is ambiguous. *Korhonen v. Allstate Ins. Co.,* 2003 ME 77, ¶ 9, 827 A.2d 833, 836. Because there is ambiguity in section 737–A(10), we look to the history of the statute and the policy behind its enactment. *See Pennings v. Pennings,* 2002 ME 3, ¶ 13, 786 A.2d 622, 627; *Mundy v. Simmons,* 424 A.2d 135, 137 (Me.1980).

C. Statutory History Of Primary Elections And Recounts In Maine

[¶ 9] From 1913 to 1961, separate statutes governed recounts in general and primary elections. The statute governing general elections specifically limited the Governor and the Executive Council's role in recounts in elections to the Legislature. *See* R.S. ch. 7, § 53 (1916); R.S. ch. 8, § 55 (1930); R.S. ch. 5, § 50 (1944); R.S. ch. 5, § 50 (1954). The role of the Governor and the Executive Council was limited to the examination and correction of returns. They had no authority to "decide whether any ballots cast in an election of a Representative to the Legislature shall be counted or rejected." *Opinion of the Justices,* 143 Me. 417, 422, 88 A.2d 151, 154 (1948).

[¶ 10] The statute governing recounts in primary elections, however, did not include the same limitation on the authority of the Governor and the Executive Council. *See* P.L. 1913, ch. 221, § 16; R.S. ch. 7, § 16 (1930); R.S. ch. 4, § 30 (1944); R.S. ch. 4, § 31 (1954). Thus, in primary elections, even those primary elections for the House of Representatives and the Senate, the Governor and Council made the final determinations in recounts. *Id.; see also Opinion of the Justices,* 124 Me. 453, 470, 126 A. 354 (1924) ("[The Governor and Council] are made by the Legislature the tribunal to pass upon the results in primary elections . . . .").

[¶ 11] In 1961, the provisions governing recounts in all elections, primary and general, were combined. P.L. 1961, ch. 360, §§ 127–132. After a recount, a candidate could appeal to the Governor and the Council, provided that:

This subsection does not apply where final determination of the election of a candidate is governed by the State or Federal Constitution.

*Id.* § 127(IV)(A). Therefore, jurisdiction of the Governor and the Council to decide recount disputes was limited only by the Constitution, which, as discussed above, grants *exclusive* jurisdiction over *general* election disputes to the Legislature. ME. CONST. art. IV, pt. 3, § 3.

[¶ 12] In 1975, when the Executive Council was abolished, the Commission on Governmental Ethics and Election Practices was given the jurisdiction to handle recounts. P.L. 1975, ch. 621, §§ 1421–1424. Initially, the Commission had jurisdiction to make a final determination in election disputes when the Federal and Maine Constitutions permitted, and was charged with submitting its findings of fact and opinion to the "body vested with final determination powers" in all other elections. *Id.* § 1423(3). The same Legisla-

ture amended section 1421, P.L. 1975, ch. 759, §§ 2–4, and subsequently, the Commission made "findings of fact and opinion on the final determination of election results in primary, general and special elections for county, state or federal offices," *id.* § 2. If the disputed election was an election for governor, legislator, or a federal office, the Commission was to submit its findings of fact and opinion to the "body vested with final determination powers." *Id.* § 4(A). In all other elections, the Commission was to submit its findings of fact and opinion to the Governor, who was then charged with making a final determination. *Id.* § 4(B), (C).

[¶ 13] Thus, the Legislature has consistently made a distinction between primary and general elections when determining what body has jurisdiction over final recount determinations.

D. Legislative History Of Section 737–A(10)

[¶ 14] Following a ballot-tampering scandal in 1992, a Special Commission to Review the Electoral Process made a series of recommendations to amend the statutory scheme governing election recounts. The Commission proposed legislation that sent all recount appeals to the courts for resolution:

> 10. **Appeal to court.** If there are enough challenged or disputed ballots to affect the result of an election, the Secretary of State shall forward the ballots and related records for that election to the clerk of the Supreme Judicial Court.
>
> The Chief Justice of the Supreme Judicial Court shall determine the result of the election pursuant to procedures adopted by court rule. The decision of the Chief Justice is final and must be

certified to the Governor by the Chief Justice.

L.D. 1477, § 35 (16th Legis. 1993). The Commission also proposed an amendment to the Constitution. L.D. 1474 (16th Legis. 1993). The proposal to amend the Constitution, however, died between the Houses. *See* 2 Legis. Rec. House H–1410 (1993).

[¶ 15] The Attorney General issued an opinion that two provisions of the bill would violate the Constitution.[1] In response, Representative Gwadosky commented as follows:

> Recently, upon enactment, we were contacted by individuals who were concerned about two provisions which they thought would make this bill essentially unconstitutional and we have an opinion from the Attorney General which in fact indicated that there were two provisions of the bill that needed to be adjusted and this amendment now to the Committee of Conference Report Amendment which was unanimous is to address those two provisions. The first deals with an unconstitutional provision in the original bill that would have allowed the Chief Justice of the Maine Supreme Court the authority to determine recounts and election proceedings of the House and Senate *members.*
>
> As you may have remembered in the original bill, 1477, there was reference to recounts and the appeals going to the Supreme Judicial Court. There was also a separate bill, L.D. 1474, which was an amendment to the Constitution because you have to in fact amend the Constitution to make that change. That bill was defeated and the reference now to the Supreme Court had to be struck from this provision.

2 Legis. Rec. House H–1410 (1993) (emphasis added). As a result, the Legisla-

---

**1.** That opinion of the Attorney General apparently was an oral opinion.

ture adopted the current language of section 737–A(10).

[¶ 16] Representative Gwadosky's comments indicate that the Legislature's intent, when enacting the amendment to section 737–A(10), was to address the constitutional problems raised in the Commission's proposed bill, in particular, the attempt to give the Supreme Judicial Court jurisdiction over recount appeals in *general* elections to the Senate and the House of Representatives, which is prohibited by Art. IV, Part 3, Section 3, of the Maine Constitution. Because, however, the Constitution does not prohibit giving the Supreme Judicial Court jurisdiction over recount appeals in *primary* elections to the Senate and the House, and Representative Gwadosky's comments refer only to constitutional concerns, the only rational conclusion is that the intent of the Legislature was to give the judicial branch jurisdiction over recount appeals in all primary elections.[2]

[¶ 17] Because of the strong legislative history suggesting that the Legislature did not intend to reserve to itself jurisdiction over recount appeals in primary elections, we conclude that we have jurisdiction over such appeals.

## II. CHALLENGED BALLOTS

[¶ 18] Having determined that we have statutory authority over these matters, we now turn to the results of the elections in question. A single justice of this Court (*Rudman, J.*) conducted a ballot inspection. Challenged ballots were identified and marked as exhibits. The exhibits were then reviewed by all of the parties.

All interested parties were then given an opportunity to present their respective positions on whether it is possible to determine the voter's choice with respect to each of the disputed ballots.

[¶ 19] Title 21–A M.R.S.A. § 691 (Supp.2003) provides directions for casting a vote in primary elections:

A voter shall mark the ballot at a primary election as instructed in the directions on the ballot.

1. INDIVIDUAL CANDIDATE METHOD. The voter must mark the ballot as instructed in the directions on the ballot to indicate the name of each candidate for nomination for whom the voter wishes to vote.

2. WRITE–IN VOTE. If the voter wishes to vote for a person whose name is not on the ballot, the voter must write the name and municipality of residence or paste a sticker containing the name and municipality of residence in the blank space provided at the end of the list of candidates for nomination to the office in question. The voter must then mark the ballot as instructed in the directions on the ballot to indicate a vote for the write-in candidate.

Voters have a statutory obligation to follow the instructions appearing on the face of the ballot. The Legislature has established by statute substantive rules that govern the inspection of disputed ballots. Title 21–A M.R.S.A. § 696 addresses the disposition of challenged, defective, and void ballots. Section 696 provides that certain votes, defined as invalid, may never be counted.[3] The first step in determining

---

**2.** Although we have given little importance to legislative inaction, *see Mahaney v. Miller's, Inc.*, 669 A.2d 165, 169 (Me.1995), we note that in 1994, just one year after section 737–A(10) was adopted, and while the Legislature that enacted section 737–A(1) was still in of-

fice, we accepted jurisdiction over a legislative primary recount appeal. *In the Matter of Republican Primary: House Dist. No. 151*, No. SJC–232 (Me. July 29, 1994).

**3.** Section 696(2)(A–E) describes invalid votes that can never be counted:

the outcome of a disputed election is to remove all those ballots containing "invalid votes." Because the Legislature has determined that these votes may *never* be counted, there is no need to attempt to discern the voter's intent.[4]

[¶ 20] Once all ballots containing invalid votes have been removed, if the number of remaining challenged ballots still affects the outcome of the election then the Court must decide whether it is possible to determine the voter's choice as reflected on the remaining ballots. Section 696(4) provides:

> 4. DETERMINATION OF CHOICE POSSIBLE. If a voter marks the voter's ballot in a manner that differs from the instructions at the top of the ballot but in such a manner that it is possible to determine the voter's choice, then the vote for the office or question concerned must be counted. A mark made on or in the voting indicator that differs from the instructions at the top of the ballot but that clearly indicates the voter's choice is not a distinguishing mark.

21–A M.R.S.A. § 696(4) (Supp.2003). Thus, notwithstanding the voter's statutory duty to follow the instructions on the

> 2. INVALID VOTE. A vote for an office, candidate or question held to be invalid by the warden, ward clerk or deputy warden may not be counted for that office, candidate or question as follows:
> A. If a voter marks more names for an office than there are vacancies to be filled, the voter's vote for that office may not be counted.
> B. If a voter marks the voter's ballot in such a manner that it is impossible to determine the voter's choice, the voter's vote for the office or question concerned may not be counted.
> C. If a voter marks a write-in indicator for an office, but does not write both a name and a municipality of residence in the blank space provided to the right of the write-in indicator, that vote for that office

ballot pursuant to section 691, if a voter deviates from the instructions on the ballot in a way that does not make it invalid under section 696, we must determine the voter's choice if it is possible.

A. In The Matter Of Republican Primary Election In Senate District 20, Docket No. SJC–239

[¶ 21] In the election for State Senator for District 20, candidates Dana L. Dow and Leslie T. Fossel both agree that they each received 1834 properly cast votes in the election. There are four disputed ballots, which we have marked as Exhibits 239–A, 239–B, 239–C, and 239–D. Because these ballots will affect the outcome of this election we must determine whether, and for whom, these votes will be counted. 21–A M.R.S.A. § 696(1) (Supp.2003). We address each disputed ballot in turn.

1. Ballot 239–A

■ [¶ 22] Ballot 239–A contains three check marks made by the voter. Two of the check marks were made in the indicator boxes, obviously demonstrating intent to vote for two of the candidates. With respect to the race for State Senate District 20, rather than place a check mark in

> is not counted, unless a determination of choice under subsection 4 is possible.
> D. If a voter writes in a name and municipality of residence, but does not mark the write-in indicator, that vote for that office may not be counted.
> E. If a voter writes in a write-in space a fictitious name, the name of a deceased person or the name of a person outside the state who could not be a candidate for office, the vote for that office may not be counted. A name in this manner is not a distinguishing mark.

21–A M.R.S.A. § 696(2)(A–E) (Supp 2003).

4. Unlike other invalid votes, as described in section 696(2)(A), (B), (D), (E), votes that are invalid pursuant to section 696(2)(C) may be saved if a determination of voter choice is possible under section 696(4).

the indicator box for candidate Dow, the voter made a check mark to the right of Dow's name, within the space on the ballot containing the candidate's name and municipality. Because this vote is not invalid pursuant to section 696(2)A–E, it must be counted if it is possible to determine the voter's choice. 21–A M.R.S.A. § 696(4).

■ [¶ 23] The significance of marking the voter indicator box cannot be understated. If the voter does not mark the indicator box for a listed candidate there must be some indicia of the voter's intent on the ballot itself before it is possible to reasonably determine the voter's choice pursuant to section 696(4).[5] The proximity of a mark to a candidate's name is an indicia of the voter's choice. Here the voter placed the mark directly adjacent to candidate Dow's name.

[¶ 24] It is clear from the face of the ballot that the check mark is the mark used by this voter to cast a vote. The mark adjacent to Dow's name is consistent with the manner in which this voter cast his or her votes. Therefore, given the proximity of the mark to Dow's name and the consistency of the mark with other votes on this ballot, we conclude the voter intended to vote for candidate Dow.

2. Ballot 239–B

■ [¶ 25] This ballot contains four marks. An "X" appears in three of the indicator boxes on this ballot: the indicator box for a named Representative for the State Legislature; the indicator box for a write-in candidate for the State Legislature; and in the indicator box for a named

candidate for the office of the Judge of Probate. The voter drew an arrow connecting the box containing Dow's name to the X in the write-in indicator box for the Representative to the Legislature. Because this vote is not invalid, we must determine the voter's choice if possible.

[¶ 26] Here we cannot say that it is impossible to determine the voter's choice. While the correct indicator box was not marked, the voter attempted to connect Dow's name to the X in the indicator box for the write-in candidate. It appears that the voter did not see the indicator boxes on the left of the candidate's name and therefore cast a vote in the indicator box on the right that was situated closest to Dow's name. In an attempt to clarify her or his choice, an arrow connects the name with the "X." The proximity of the mark to the candidate's name, and the fact that the voter had clearly voted for another candidate for the Representative race both indicate that the voter intended the mark as a vote for candidate Dow.

3. Ballot 239–C

■ [¶ 27] Ballot 239–C provides ovals as indicator boxes and instructs the voter to "Complete the oval at the left of the name of the candidate." The voter darkened six of the indicator ovals. Two of the darkened ovals, however, contain markings outside of the borders of the oval. In the oval marked for the race for Representative for Congress, the oval is darkened with an asterisk drawn over it. In the race for Senate District 20 there are two

---

5. Section 696(4) states that, where possible, the voter's choice must be determined. In interpreting this language, we must attempt to give it its "real purpose ... avoiding results that are absurd, inconsistent, unreasonable, or illogical." *Town of Eagle Lake v. Comm'r. Dept. of Educ.*, 2003 ME 37, ¶ 7, 818 A.2d 1034, 1037. Therefore, the discernment

of the voter's intent must be a reasonable process and not naked speculation. Requiring some indicia of choice when a voter has not marked the indicator box avoids the absurd circumstances that otherwise result from attempting to guess at what a voter may intend by any number of vagrant marks outside the indicator box.

darkened ovals. The voter darkened the oval for candidate Dow and the oval for candidate Fossel, and then made scribble marks over the oval darkened for Dow. Thus, the vote for Fossel is cleanly darkened while the oval for Dow appears to have been scribbled over.

[¶ 28] This ballot is not invalid pursuant to section 696, and therefore, because it is possible to discern the voter's choice, it must be counted. The appearance of cleanly darkened ovals indicates that the voter was capable of properly casting a vote. Scribbling out, making an X, or making an asterisk over a marked vote indicator are all common methods used by voters to retract a cast vote.

■ [¶ 29] It has been suggested that the voter may have been merely attempting to emphasize her or his choice. While this is one possible interpretation, our obligation under the statute is to determine the most reasonable interpretation. If multiple interpretations are equally reasonable, then the vote may not be counted. *See* 21–A M.R.S.A. § 696(2), (4). Here, while there is more than one possible interpretation of the extraneous scribbles over the vote for Dow, it is most reasonable to interpret the scribbles as a revocation of the voter's choice. Such an explanation is consistent with the cleanly cast vote for candidate Fossel. Therefore, vote 239–C shall be counted as a vote for candidate Fossel.

4. Ballot 239–D

■ [¶ 30] This ballot uses boxes as voter indicators and instructs the voter to use an "X" or a check in the box to indicate her or his intent. The voter placed five Xs in various vote indicators on the ballot. In the race for State Senator an X was placed in the box corresponding to both candidate Dow's name, as well as candidate Fossel's name. The "X" corresponding to candidate Fossel, however, has been scribbled over. This clearly appears to be an attempt to revoke the vote cast for candidate Fossel.[6] It is unlikely that the voter intended to vote for two candidates for the same office. Because the vote for Dow conforms to the ballot's instructions as well as the other votes on the ballot, we conclude that the voter intended to cast a vote for candidate Dow. Accordingly, Dow is declared to be the winner of this primary election.

B. In The Matter Of Democratic Primary Election In House District 137, Docket No. SJC–240

[¶ 31] After a recount in the election for Representative to the Legislature for District 137, Alan Casavant received 435 votes, Richard Rhames received 437 votes, and three disputed ballots were certified to the Court. Because these ballots may affect the outcome of this election we must determine whether, and for whom, these votes will be counted. 21–A M.R.S.A. § 696.

1. Ballot 240–A

■ [¶ 32] This ballot uses ovals for write-in indicators. Voters are instructed to complete the oval to the left of the candidate. The voter partially darkened two ovals for the race in question: the oval to the left of candidate Casavant and the oval for a write-in candidate. The voter left the line provided for writing in the write-in candidate's name blank. Pursuant to section 696(2)(A) when a voter

---

**6.** The ballot contains some writings beside the indicator boxes. There is no dispute these writings were added by ballot clerks during the tabulation of votes. Accordingly, there is no issue as to whether these marks may be distinguishing marks such to invalidate the ballot pursuant to 21–A M.R.S.A. § 696(5)(A) (Supp.2003).

"marks more names for office than there are vacancies to be filled, the voter's vote for that office may not be counted." Therefore if the voter voted for more than one person for District 137 the vote is invalid and we do not attempt to ascertain voter intent. The issue, therefore, is whether a vote was cast for a write-in candidate, even though no name was written in.

[¶ 33] The voter casts a vote by marking the indicator boxes. Marking of the indicator box is the ultimate act of voting. Section 696(2)(D) provides that even if a voter writes in a candidate's full name and correct municipality in the write-in section, if the voter does not mark the appropriate indicator box, that vote may not be counted. Thus, the statute places central ultimate significance on the indicator box as the space allotted to the voter for expressing choice. The write-in line adjacent to the voter indicator oval is provided so that the voter may state the individual for whom the voter has voted, but the oval itself is the vote.

[¶ 34] Because the voter marked the indicator box for a write-in candidate and made no attempt to revoke it with extraneous marks, the vote for candidate Casavant must be seen as a second vote.[7] Because this vote is invalid under section 696(2)(A), we do not attempt to determine the voter's choice under section 696(4).

2. Ballot 240–B

■ [¶ 35] On this ballot, the voter darkened ovals for various candidates in accordance with the directions on the ballot. One oval is completely darkened in each contested race on the ballot. In the race for District 137, however, in addition to neatly darkening the oval corresponding to candidate Casavant, a line appears in the oval corresponding to candidate Rhames. The voter has consistently marked the ballot according to the directions, and has voted for only one candidate in every other contested election. The stray mark appearing in the oval corresponding to candidate Rhames is nothing more than a stray mark, in no way resembling a vote. Therefore, we hold that the vote for candidate Casavant is not invalid, and must be counted.

3. Ballot 240–C

■ [¶ 36] On this ballot, the voter has clearly cast three votes in three different races by darkening an oval in accordance with the directions. In the race for District 137 no oval is darkened. A single dot appears in the oval corresponding to candidate Rhames. Given the voter's demonstrated ability to comply with the instructions and fully darken ovals when voting, we cannot reasonably interpret this mark as anything other than a stray marking. Therefore we do not count this vote.

[¶ 37] Counting disputed ballot 240–B for candidate Casavant, the election results for Representative to the Legislature for District 137 are as follows: Alan Casavant receives 436 votes and Richard Rhames receives 437 votes. Therefore, Richard Rhames is declared the winner of this primary election.

C. In The Matter Of Democratic Primary Election In Senate District 29, Docket No. SJC–241

■ [¶ 38] Kim M. Bagley ran in the Democratic primary election for Senate

7. This conclusion is consistent with the voter's ballot markings in the races for Judge of Probate and District Attorney. In the race for Judge of Probate, the voter marked the indicator boxes for all 5 named candidates as well as the write-in box. In the race for District Attorney, the voter marked the indicator boxes for both candidates as well as the write-in box.

District 29 as a write-in candidate. As a write-in candidate she was required to receive 200 votes in order to receive the nomination. *See* 21–A M.R.S.A. §§ 723, 335 (1993 & Supp 2003). There are a total of 279 ballots with markings in the Senate District 29 space. At the conclusion of the recount, the municipalities in the District reported that 173 valid write-in votes were cast for candidate Bagley. Candidate Bagley contends that, out of the 279 ballots containing some markings in the District 29 space, she received 211 votes. Because the number of disputed ballots may affect the outcome of the election, pursuant to 21–A M.R.S.A. § 737–A, we determine its outcome.

[¶ 39] In order to support her claim that she received 211 votes, candidate Bagley relies, among other things, upon 17 votes on which the indicator box for the write-in candidate was not marked. These votes are clearly invalidated by section 696(2)(D) which provides:

> If a voter writes in a name and municipality of residence, but does *not* mark the write-in square, the vote for that office shall *not* be counted. (Emphasis added).

21–A M.R.S.A. § 696(2)(D) (Supp.2003).

The plain language of title 21–A M.R.S.A. § 696(2)(D) makes it clear that, with respect to write-in candidates, if a voter fails to mark the voter indicator that vote may not be counted. The fact that the voter may have written in the correct name and municipality for the candidate does not matter. Because the 17 votes on which the indicator box for the write-in candidate was not marked cannot be counted, candidate Bagley received at most 194 votes.

[¶ 40] In section 696(2)(A–E), the Legislature has determined that certain markings may never be counted as votes, irrespective of whether a voter's choice can be determined pursuant to section 696(4). Because the remaining disputed ballots cannot affect the outcome of the election we need not consider their validity; the initial election results are hereby affirmed. Candidate Bagley did not receive the requisite 200 valid votes.

[¶ 41] The decisions in SJC Docket Nos. 239, 240, and 241 shall, in accordance with 21–A M.R.S.A. § 737–A(10), be certified to the Governor by the Chief Justice.

/s/ Leigh I. Saufley
Chief Justice

/s/ Robert W. Clifford
Associate Justice
/s/ Paul L. Rudman
Associate Justice
/s/ Howard H. Dana
Associate Justice
/s/ Donald G. Alexander
Associate Justice
/s/ Susan Calkins
Associate Justice
/s/ Jon D. Levy
Associate Justice