STATE OF MAINE
CUMBERLAND, ss

STATE OF MAINE
CUMBERLAND, SS
CLERK'S OFFICE

2004 DEC -3 P 12: 24

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-04-695
TDW-CUM-

In Re:

ELECTION FOR SCHOOL COMMITTEE
REPRESENTATIVE FOR DISTRICT 3
IN THE CITY OF PORTLAND

DECISION AND ORDER

DEC 27 2004

   The above-captioned proceeding was commenced when the City of Portland delegated its authority to decide a disputed municipal election to the Superior Court pursuant to 30-A M.R.S.A. § 2531-A(11) (Supp. 2003). The election in question involves the race for School Committee Representative for City District 3.

   After a recount held on November 10, 2004 candidate Julia Finn had 3,217 votes and candidate Jason Toothaker had 3,216 votes. There were 13 disputed ballots. Seven of the disputed ballots were included in the foregoing vote totals, and six of the disputed ballots have not been counted for either party pending the outcome of this proceeding.

   On November 19, 2004 an initial scheduling conference was held at which counsel for the City and for the two contesting candidates appeared. On November 22, 2004 a subsequent conference was held at which the issues were framed and the schedule for further proceedings was established as set forth in the court's order of the same date. At that time the parties agreed that the seven disputed ballots already included in the candidates' vote totals had been correctly included. This left six disputed ballots, designated as R-1, R-12, R-13, R-14, R-15, and R-16.

On December 1, 2004 a hearing was held for the parties to offer evidence and legal argument with respect to the six disputed ballots. At that hearing counsel for the candidates agreed that disputed ballot R-1 should not be counted. They then offered evidence in the form of a stipulation with respect to ballot R-14 and legal argument with respect to all five remaining disputed ballots. These presentations were supplemented with written submissions from both candidates on December 2, 2004.

The court has considered the arguments made by counsel at the December 1 hearing and in their written submissions. The court has also reviewed the stipulation with respect to ballot R-14 and the record provided by the City with respect to that ballot. Finally, the court has examined ballots R-12, R-13, R-15, and R-16 to see if the voters' intent can be determined with respect to those ballots.

Ballot R-14

There is no dispute that the voter who cast ballot R-14 correctly followed all relevant instructions to mark that ballot for candidate Toothaker. However, ballot R-14 was cast in the wrong precinct because the voter in question arrived at the wrong precinct just before the polls closed at 8 pm.

The election officials at that precinct allowed the voter to cast a challenged ballot pursuant to instructions the City had received from the Secretary of State's office. Those instructions were that persons who came to the wrong voting district should be refused ballots so long as there remained a reasonable time for them to travel to the correct polling place. Pursuant to these instructions the City determined that voters who came to the wrong polling place prior to 7:45 pm would be refused ballots and instructed to go to the correct precinct. As

of 7:45 pm voters who arrived at the incorrect precinct would be allowed to cast ballots there but would be told that their ballots were subject to challenge.[1]

Maine law permits a municipality to be divided by voting districts, which include wards and precincts. 21-A M.R.S.A. §§ 631 (1992 and Supp. 2003), 631(6) (Supp. 2003), and 1(48) (Supp. 2003). However, there is no longer a legal requirement that voters can only vote in their assigned voting districts. Section 115(2) of Title 21-A used to provide that in a municipality which has different voting districts, a voter could only vote in the specific voting district in which that voter resided. See 21-A M.R.S.A. § 115(2) (1992) (prior to amendment). In 1995, however, that section was changed to require only that a voter must use the correct ballot for the voting district in which the voter resides. 21-A M.R.S.A. § 115(2) (Supp. 2003), as amended by Laws 1995, ch. 459, § 13.[2]

In this case it is undisputed that the voter who cast ballot R-14 received the same ballot that voter would have received if he or she had voted in the correct precinct. As a matter of state election law, therefore, ballot R-14 was not invalidly cast.

The court has considered the argument that voters who appeared at an incorrect precinct earlier in the day were not allowed to vote there and were instead directed to report to the correct precinct. While it is suggested that this constituted disparate treatment that violated the constitutional requirement of equal protection under Bush v. Gore, 531 U.S. 98 (2000), the court disagrees. First, the court sees no disparate treatment in an evenhanded policy requiring voters to vote at the correct polling place until there is not enough time remaining for them to be able to travel there. There might be an argument of disparate treatment under Bush v. Gore if some polling places had accepted ballots from late voters who presented

_____

[1]    The stipulation submitted by the parties indicates that even before 7:45 pm a voter could have been given the option of casting a ballot at the wrong precinct if the precinct warden deemed there was not reasonable time for that voter to get to the correct polling place.
[2]    As a practical matter, voters still need to vote at the correct polling place because that is where the voting list is maintained so that voters can be checked in. See 21-A M.R.S.A. §§ 652 (Supp. 2003), 671(2) (1992).

3

themselves at the wrong precincts while other polling places had refused such ballots. In this case, however, a standard citywide policy prevailed.

Second, although it has been stipulated that some voters who presented themselves at the wrong polling places before 7:45 pm were in fact turned away and directed to go to the correct precinct, no evidence has been presented that any of those voters actually failed to vote as a result. The court has some difficulty disqualifying ballot R-14 because of the bare possibility that a voter turned away at an incorrect polling place earlier in the day may have failed to vote because he or she never went to the correct polling place.

Ballot R-14 shall be counted as a ballot for candidate Toothaker.

## Ballots R-12 and R-13

The voters who cast these two ballots did not follow the instructions that appeared on the face of the ballot, which directed them to fill in an oval to the left of the candidates of their choice. Leaving all the candidate ovals blank, they instead have made marks in the spaces that appear to the right of candidates' names. Specifically, with respect to the relevant School Committee race, a black oval has been placed to the right of candidate Toothaker's name on ballot R-12, and a vertical mark has been placed to the right of candidate Finn's name on ballot R-13.

As to these ballots, the court is required to follow the analysis contained in 21-A M.R.S.A. § 696 (Supp. 2003) governing the counting of challenged ballots. See In re Primary Election Ballot Disputes 2004, 2004 ME 99, ¶¶ 19-20, 857 A.2d 494, 500-01.

> [N]otwithstanding the voter's statutory duty to follow the instructions on the ballot pursuant to section 691, if a voter deviates from the instructions on the ballot in a way that does not make it invalid under section 696, we must determine the voter's choice if it is possible.

Id. ¶ 20, 857 A.2d at 501. Specifically, under section 696(2), certain ballots are invalid and can never be counted. See §§ 696(2)(A), (D), (E). If a ballot is not invalid under those subsections, the court must decide whether it is possible to determine the voter's choice of candidate under section 696(4), which provides:

> If a voter marks the voter's ballot in a manner that differs from the instructions at the top of the ballot but in such a manner that it is possible to determine the voter's choice, then the vote for the office or question concerned must be counted. A mark made on or in the voting indicator that differs from the instructions at the top of the ballot but that clearly indicates the voter's choice is not a distinguishing mark.

Neither ballot R-12 nor ballot R-13 is invalid under sections 696(2)(A), 696(2)(D), or 696(2)(E). Proceeding to the question of whether voter intent can be determined under section 696(4), it is apparent that these ballots consistently indicate the voter's choice by marks in the spaces to the right of the candidates' names. The proximity of a mark to a candidate's name is indicative of voter choice. See In re Primary Election Ballot Disputes 2004, 2004 ME 99, ¶ 23, 857 A.2d at 502. In each case the same kind of marks have been used for all of the candidates chosen, and no other marks appear on the ballot.

Therefore, ballot R-12 shall be counted for candidate Toothaker, and ballot R-13 shall be counted for candidate Finn.


Ballot R-15

Ballot R-15 presents a closer case. On that ballot none of the ovals for candidates have been filled in. Instead, the names of candidates have been underlined. Thus, where the voter was instructed to vote for one candidate for City Council from District Three and one candidate for Portland Water District Trustee, one name is underlined in each case. In those cases where the voter was instructed to vote for two candidates (City Council At Large and

School Committee At Large), two names have been underlined in each case. In the race for School Committee District Three, a line appears under candidate Toothaker's name.

The lines in question are not ruler straight but somewhat wavering. They are not located a uniform distance under the candidates' names but in some cases touch the bottom of the candidates' names and in other cases are drawn below the candidates' addresses. The lines extend beyond the candidates' names, and in one case (the City Council at Large seat) the line extends almost to the edge of the page. There are also a number of stray marks on the ballot. All of those stray marks, however, are considerably lighter than the heavier underlining used for candidates' names. None of the stray marks constitute "distinguishing marks" intended by a voter to identify his of her ballot. See 21-A M.R.S.A. § 696(5)(A).

Ballot R-15 is not invalid under sections 696(2)(A), 696(2)(D), or 696(2)(E). The remaining question is whether the ballot is marked in such a way that it is possible to determine the voter's choice. If so, the vote must be counted under section 696(4).

The court concludes that, notwithstanding the stray marks and wavering lines on ballot R-15, it is possible to determine the voter's choice — to vote for the candidates whose names are underlined. In each case the underlining is purposeful and in direct proximity to a candidate's name. The same method is consistently used to designate the chosen candidates.

Where a voter's intent can be determined, even if the voter's grip of the pen is shaky, the voter has a right to have his or her vote counted. Ballot R-15 therefore shall be counted for candidate Toothaker.


Ballot R-16

On ballot R-16, the ovals next to both candidate Finn and candidate Toothaker have been filled in. Underneath, in the area reserved for a write-in candidate, the name Jason

Toothaker has been inserted. However, the oval to designate a vote for a write-in candidate has not been filled in.

Under 21-A M.R.S.A. § 696(2)(A), if a voter marks more names for an office than there are vacancies to be filled, the vote may not be counted for that office. In this case there is only one vacancy to be filled. Because ballot R-16 contains marks in the ovals for two candidates, it cannot be validly counted under section 696(2)(A).

Moreover, even if the court were to assume for purposes of argument that the voter intended to supersede the offsetting marks for both Finn and Toothaker by casting a write-in vote for Toothaker, ballot R-16 cannot be found to constitute a valid write-in vote for candidate Toothaker because no mark was made in the oval voting indicator for a write-in candidate. Section 696(2)(D) provides that when a voter writes in the name and residence of a candidate, the vote may not be counted as a write-in vote if the voting indicator for the write-in candidate is not marked.

As a result, ballot R-16 is invalid under both sections 696(2)(A) and 696(2)(D).[3] Accordingly, there is no basis on which to proceed to the next step and attempt to ascertain voter intent. See In re Primary Election Ballot Disputes 2004, 2004 ME 99, ¶¶ 32-33, 857 A.2d at 503-04. Ballot R-16 shall not be counted.

In sum, ballots R-12, R-14, and R-15 shall be counted for candidate Toothaker and ballot R-13 shall be counted for candidate Finn. The result is that candidate Toothaker received 3,219 votes and candidate Finn received 3,218 votes.

---

[3] Put another way, if ballot R-16 would not be valid if the voter had marked ovals for both Finn and Toothaker (while leaving the write-in space blank) and also would not be valid if the voter had written in Toothaker's name without marking the write-in oval (while leaving the designated ovals for both Finn and Toothaker blank), ballot R-16 cannot be found to be valid just because both of those mistakes were made simultaneously.

7

The entry shall be:

Candidate Jason Toothaker is declared the winner of the election for Portland School Committee Representative, District 3. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: December 3, 2004

Thomas D. Warren
Justice, Superior Court