2008 ME 117

**In the Matter of PRIMARY ELECTION BALLOT DISPUTE 2008.**

Supreme Judicial Court of Maine.

Heard: July 7, 2008.

Decided: July 15, 2008.

William P. Keefe, Esq., Yarmouth, ME, for Melissa Walsh Innes.

Harold C. Pachios, Esq. (orally), Preti, Flaherty, Beliveau & Pachios, LLP, Portland, ME, for Kimberly A. McLaughlin.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

## DECISION ON CERTIFICATION OF NOMINEE

[¶ 1] The Deputy Secretary of State has notified the Clerk of the Supreme Judicial Court that, at the conclusion of the recount in the 2008 Democratic Party Primary Election between Melissa Walsh Innes and Kimberly A. McLaughlin for House District 107, there were enough disputed ballots to affect the outcome of that primary race, and those disputes must be resolved. We exercise our jurisdiction over the matter, *see* 21–A M.R.S. § 737–A(10) (2007); *In re Primary Election Ballot Disputes 2004*, 2004 ME 99, ¶¶ 3–17, 857 A.2d 494, 496–500, and conclude that Innes is the winner of the Democratic primary election in House District 107 by a vote of 485 to 484.

## I. BACKGROUND

[¶ 2] At the close of voting in the 2008 primary elections on June 10, the official return for the House District 107 Democratic primary race indicated a tie vote of 485 votes for Melissa Walsh Innes and 485 votes for Kimberly A. McLaughlin. *See* 21–A M.R.S. § 856 (2007). Both candidates requested a recount pursuant to 21–A M.R.S. § 737–A (2007).[1]

[¶ 3] On June 19, 2008, the Secretary of State supervised a recount of the ballots in the Democratic primary in House District 107.[2] Each candidate provided individuals to act as counters, as required by the Secretary of State's recount rules. *See* 8A C.M.R. 29 250 501–2 5(A) (1999). Each candidate also had a legal representative

---

1. This statute was recently amended, effective after the June 10, 2008, Democratic primary election. *See* P.L. 2007, ch. 515, §§ 7–9 (effective June 30, 2008) (codified at 21–A M.R.S. § 737–A).

2. The events that took place at the recount in this case were not recorded, and neither party

offered specific testimony regarding the recount proceedings. We discern the facts from the representations made by the candidates in their pleadings and by the candidates' counsel at the hearing before us. None of these facts are in dispute.

present at the recount. *See* 8A C.M.R. 29 250 501–38(C) (1999). Those counting the ballots followed the Uniform Guidelines for Determining Voter Intent, which the Secretary of State published pursuant to the statutory mandate of 21–A M.R.S. § 696(6) (2007). *See* Me. Sec'y of State, Uniform Guidelines for Determining Voter Intent (Sept. 2007).

[¶ 4]  The recount resulted in the following tally: 484 votes for Innes, 482 votes for McLaughlin, fifty-seven ballots on which no vote was cast for either candidate, and three disputed ballots. The Secretary of State's representative and counsel for candidate Innes signed an agreement to this final count. *See* 8A C.M.R. 29 250 501–3 8(C) (1999). Counsel for McLaughlin declined to sign the agreement because of the discrepancy between the 969 votes tallied through the recount and the 970 votes tallied for the two candidates by the two electronic tabulation machines used on the day of the election.

[¶ 5]  After the recount, the Deputy Secretary of State notified the Clerk of the Supreme Judicial Court that, at the conclusion of the recount in the Democratic primary in House District 107, there were enough disputed ballots to affect the outcome of that primary race, and the disputed ballots required resolution.

[¶ 6]  We issued a preliminary procedural order setting the dispute for hearing before the Supreme Judicial Court, *see* 21–A M.R.S. § 737–A(10), and requesting memoranda from the parties, which they provided. We also asked the Secretary of State to file copies of the disputed ballots and deliver the disputed ballots themselves on the day of the hearing. The Secretary of State filed the requested copies with us and delivered the ballots on the day of oral argument. The candidates and their counsel had the opportunity to examine the ballots. We reviewed the ballots, after which the Secretary of State's representative, under observation by both candidates, locked and resealed the box in which the ballots arrived.

[¶ 7]  At the hearing, both candidates had the opportunity to present witnesses. One witness was offered—Douglas W. Jones, a professor in the Department of Computer Science at the University of Iowa—whom McLaughlin offered as an expert on the accuracy of electronic tabulation machine-counts.[3] Both parties also had an opportunity for argument concerning the law and the facts of this case. Their arguments focused on how the disputed ballots should be treated and whether McLaughlin is entitled to have one more vote counted in her favor based on the vote tabulation machines' original vote count. Having considered the evidence and the parties' arguments, we now turn to the issues before us.

## II.  DISCUSSION

[¶ 8]  When a voting district uses an electronic tabulating system, "[t]he official return of each voting district is derived from the totals from the official tally tape, the totals from the hand-tallies of all redlined or unread ballots and the tally sheets used to record all valid write-in votes." 21–A M.R.S. § 856. The vote tallied pursuant to this process in the 2008 Democratic primary race for House District 107 was a tie of 485 votes for Innes and 485 votes for McLaughlin, all derived from the two electronic tabulating machines' tally tapes.

[¶ 9]  Because the parties requested a recount pursuant to 21–A M.R.S. § 737–A, the Secretary of State directed the State

---

**3.**  To the extent that Innes objected to Jones's   testimony, her objections are overruled.

Police to "take physical control of all ballots and related materials involved in the recount as soon as possible." *Id.* The recount of these secured ballots was conducted in accordance with the procedures set forth in section 737–A and the Secretary of State's procedural rules governing election recounts, *see* 8A C.M.R. 29 250 501–1 to –3 (1999). The people counting the ballots were guided by the statutory provisions governing challenged, defective, or void ballots, 21–A M.R.S. § 696 (2007), and the Secretary of State's Uniform Guidelines for Determining Voter Intent.

[¶ 10]   In conducting the recount to determine the outcome of a disputed election, invalid votes are first set aside. *See* 21–A M.R.S. § 696(2); *In re Primary Election Ballot Disputes 2004,* 2004 ME 99, ¶ 19, 857 A.2d at 500–01. The remaining unchallenged and challenged ballots are then counted. *See* 21–A M.R.S. § 696(1). If the challenged ballots are of such a quantity that they could affect the outcome of the election, we are called upon to review them. *See* 21–A M.R.S. §§ 696(1), (4), 737–A(10); *In re Primary Election Ballot Disputes 2004,* 2004 ME 99, ¶ 20, 857 A.2d at 501.

[¶ 11]   Upon the recount conducted in the present case pursuant to the pertinent statutes, rules, and guidelines, the final tally was reported as 484 votes for Innes, 482 votes for McLaughlin, fifty-seven ballots that did not include a vote for either candidate, and three disputed ballots. Taking into account only the *unchallenged* ballots, two votes separate the candidates. The ballots in dispute could, therefore, affect the outcome of the election, and we exercise our jurisdiction to resolve the ballot disputes. *See* 21–A M.R.S. §§ 696(4), 737–A(10); *In re Primary Election Ballot*

*Disputes 2004,* 2004 ME 99, ¶ 20, 857 A.2d at 501.

[¶ 12]   We first examine the three challenged ballots received from the Secretary of State to determine whether we can discern the voter's choice. After making this determination, we address McLaughlin's additional argument that she should receive another vote due to the discrepancy between the total machine-tallied vote count on the day of the election (970 total votes for the two candidates) and the vote count that resulted from the recount (969 total votes for the two candidates).

**A.   Disputed Ballots Identified During the Recount**

■   [¶ 13]   The ballot used in the House District 107 Democratic primary instructed voters to "[c]omplete the oval ... at the left of the name of the person you want to choose." Although a voter must, according to statute, cast his or her vote as directed in the ballot's instructions, *see* 21–A M.R.S. § 691(1) (2007), a vote that is not fully compliant will nonetheless be counted if it is possible to determine the voter's choice from examining the ballot and if the ballot is not otherwise void, defective, or invalid, *see* 21–A M.R.S. § 696(1)-(5); *In re Primary Election Ballot Disputes 2004,* 2004 ME 99, ¶ 20, 857 A.2d at 501; Me. Sec'y of State, Uniform Guidelines for Determining Voter Intent (Sept. 2007).[4]

**1.   Ballots for Innes and McLaughlin Disputed Due to Possible Erasure**

■   [¶ 14]   We first consider the two ballots that are in dispute due to the voters' possible attempts at erasure. One of the disputed ballots potentially includes a vote for Innes, and the other potentially includes a vote for McLaughlin. On each

---

4.   To aid in evaluating whether a ballot demonstrates a voter's choice, the Secretary of State has published Uniform Guidelines for Determining Voter Intent in accordance with 21–A M.R.S. § 696(6) (2007).

ballot, the marks in the ovals were light but discernable. Other than the lightness of the markings, the ballots were otherwise in conformity with the ballot instructions.

[¶ 15] The candidates, having examined the individual ballots, agree that the votes cast in these two ballots should be counted. Based on our review of the ballots under the applicable law, we agree, and we count both ballots.[5] As a result, each candidate receives an additional vote.

### 2. Ballot Challenged Due to a Possible Distinguishing Mark

■ [¶ 16] The final ballot we consider contains an extraneous mark next to the name of a candidate for State Senate in District 11. The ballot also contains a clearly marked vote for McLaughlin in the House District 107 race.

[¶ 17] By statute, "A ballot on which a voter has made a distinguishing mark is void." 21–A M.R.S. § 696(5)(A). The term "distinguishing mark" is defined by statute:

> "Distinguishing mark" means a mark on a ballot of a type or in a place not specifically permitted by this Title, which indicates the apparent intent of the voter to make the voter's ballot distinguishable in a manner that is fraudulent or inconsistent with an honest pur-

---

5. The Secretary of State's Uniform Guidelines for Determining Voter Intent provide instruction on evaluating a cross-out or erasure, but they only discuss the situation where the voter has filled in more than one indicator in a single race:

**Cross-outs or erasures**
Where the voter has filled in more than one indicator for an office or ballot question, a vote for one of those candidates or ballot question choices may still be counted under the following circumstances:
☐ if one of the voting indicators for the two candidates or ballot question choices is crossed out or scribbled over, the vote should be counted for the other candidate or ballot question choice for which the indicator is filled in and not crossed out or scribbled over
☐ *if it is apparent that the voter erased the markings on one indicator, the vote should be counted for the other candidate or ballot question choice for which the indicator is clearly filled in*
**Note:** If one indicator is merely filled in more lightly than the other, such that it is impossible to tell whether the voter intended to eliminate one choice, then no vote for that office or ballot question should be counted.

Me. Sec'y of State, Uniform Guidelines for Determining Voter Intent II(C) (Sept. 2007). Historically, however, the attempted erasure or crossing-out of a vote has been considered a reason not to count a vote when the inten-

tion to revoke the vote is evident from the ballot. *See Pease v. Ballou*, 108 Me. 177, 179, 79 A. 532, 532–33 (1911).

The guidelines do address when to count a vote when the voter has made some mark but has not fully completed it:

**Failure to fully mark voting indicator**
Where the voter has made some mark in the voting indicator, but has not fully completed it, the vote should be counted if:
☐ an "x", check mark, plus sign, asterisk, star, or a definite line (horizontal, vertical or diagonal) has been placed within the voting indicator
☐ the majority of space in the voting indicator (arrow, box or oval) is filled in
☐ it appears from the nature of the mark in the voting indicator space that the voter intentionally moved the pen or pencil across the paper from one point to another
☐ *the voter has marked the voting indicator in the same manner for other offices or ballot questions on the same ballot*
The vote should <u>not</u> be counted if:
☐ there is only a small dot or light pen or pencil mark inside the voting indicator that could have been made by merely resting the pen or pencil on the ballot
☐ the marking is unclear and is inconsistent with the manner in which the voter has marked the rest of the ballot

Me. Sec'y of State, Uniform Guidelines for Determining Voter Intent § II(A) (Sept. 2007) (emphasis added).

pose. A stray mark on the ballot or mark made on or in the voting indicator or near the candidate's name or space for a write-in candidate that differs from the instructions at the top of the ballot is not a distinguishing mark unless it is of such a character or is made in such a manner that it manifests an intent to make the ballot distinguishable for a fraudulent or dishonest purpose. Marking the write-in space on a ballot with the name of a fictitious person, a deceased person or a person from outside the State who could not be a candidate for that office is not a distinguishing mark unless it is made in such a manner that manifests an intent to make the ballot distinguishable for a fraudulent or dishonest purpose.

21–A M.R.S. § 1(13) (2007).

[¶ 18] The Secretary of State's Uniform Guidelines for Determining Voter Intent provide the following guidance on determining whether a ballot is void for containing a distinguishing mark:

**Void ballots/distinguishing marks. 21–A M.R.S.A. § 696(5)(A)**

A ballot is void if it has been marked by the voter in a manner that shows an intent to distinguish it from other ballots for a fraudulent or dishonest purpose. Such markings are considered "distinguishing marks" as defined in statute, 21–A M.R.S.A. § 1(13).

Thus, the ballot should be rejected and marked "void" if it contains any of the following:

- ☐ the voter's name
- ☐ the voter's initials, other than where the voter has initialed the cross-out of a voting indicator (as described in part II.D of these Guidelines) merely to indicate that he or she made that change
- ☐ a number

- ☐ a unique symbol where it appears that the voter's intent was to enable a person to determine who cast the ballot
- ☐ a comment or statement that indicates the identity of the voter either individually or as a member of an identified group

Me. Sec'y of State, Uniform Guidelines for Determining Voter Intent I(B) (Sept. 2007).

[¶ 19] The current statutes and guidelines are consistent with historical pronouncements that, for a ballot to be void for containing a distinguishing mark, the mark must communicate the voter's intention to make the ballot identifiable:

After a careful consideration of the subject in view of the purpose of the law and the sacredness of the right of franchise, we are of opinion that before a ballot is rejected because of an alleged distinguishing mark, we should be satisfied from an inspection of the ballot itself, which is the only evidence before us, of three things:

First, that the mark is in fact a distinguishing mark, that is a mark or device of such a character as to distinguish this ballot from others.

Second, that it was made intentionally and not accidentally.

Third, that it was intended to be a distinguishing mark. In other words we think no ballot should be rejected on the ground of bearing a distinguishing mark unless it is such a one as fairly imports, upon its face, design and a dishonest purpose.

A mark upon a ballot may be a distinguishing mark in fact, and yet be of such a character as to show that it was accidentally made, or even that it was intentionally made, but for some other purpose than a distinguishing mark, because a distinguishing mark in fact is

not necessarily a distinguishing mark in law.

*Opinion of the Justices*, 161 Me. 32, 38, 206 A.2d 541, 549 (1965) (quotation marks omitted).

[¶ 20]   After examining the ballot that was challenged on the basis that it contained a distinguishing mark, we find that the mark on this final disputed ballot is not a letter or other recognizable mark.   We cannot regard the extraneous mark on this ballot as a distinguishing mark intended to communicate information about the voter for a fraudulent or dishonest purpose in violation of the relevant statutes and guidelines.   Accordingly, this ballot is not void, and the vote contained in the ballot will be counted for McLaughlin.

### 3.   Vote Count Including the Three Disputed Votes

[¶ 21]   Having found that the votes cast in all three identified disputed ballots should be counted, the resulting vote tally in the House District 107 Democratic primary race is 485 votes for Innes and 484 votes for McLaughlin.   Because an additional vote for McLaughlin could result in a tie, we now consider her contention that she is entitled to the additional vote counted for her by the electronic tabulating machines.

### B.   Potential Missing Ballot

[¶ 22]   McLaughlin argues that the machine tally from election night—485 votes for each candidate for a total of 970 votes cast in the race—should be credited as the proper vote count and that the recount tally of 969 votes, with the three challenged votes included, should be regarded as inaccurate for missing one vote for her.   She argues that the statutory scheme contemplates an official tally derived primarily from the machine count and that, absent an identified mistake, the machine tally must be accepted, citing 21–A M.R.S. § 737–A(8).[6]   We therefore review the election statutes to determine whether the machine tally of 970 votes or the recount tally of 969 votes controls the outcome of the election.

[¶ 23]   By statute, when a voting district uses an electronic tabulating system, the initial, official return is derived from the official tally tapes generated by the machines used on election day.   21–A M.R.S. § 856.   If there is no request for a recount, section 856 controls the final election count.   If, however, as in the case before us, the parties request a recount pursuant to 21–A M.R.S. § 737–A, the derivation of the final count changes.   Human beings, rather than electronic tabulation machines, undertake a complete recount of all relevant ballots.

[¶ 24]   Because the responsibility for the vote tally shifts from the machines' tally tapes to the recount process by operation of section 737–A, the recount tally will control, after resolution of challenged ballots, unless there is persuasive evidence of error or misdeed in the recount process.   No such evidence exists in the matter before us.   The recount was conducted in accordance with the statutes, guidelines, and procedural rules applicable to a recount.   Neither party disputes that each provided counters and had representatives present during the recount to ensure that no ballot was overlooked.   *See* 8A C.M.R. 29 250 501–2, –3, 5(A), 8(C) (1999).

[¶ 25]   Despite the best efforts of the candidates, we are able to determine only that there could be many explanations for

---

6.   The statute provides, "If it is found that a mistake was made in counting the ballots on election day, the Secretary of State shall submit a corrected tabulation to the Governor." 21–A M.R.S. § 737–A(8) (2007).

the one-vote discrepancy between the machine tally and the recount tally. The difference could have been caused by machine error. It is possible that one of the machines counted a stray mark on a blank ballot, double counted a ballot during a paper jam, or calculated an extra vote due to occlusion or malfunction of an optical scanner.[7] It is also possible that the manual recount could have been incorrect, whether because of a simple miscount or because a ballot mistakenly remained in the wrong pile.

[¶ 26] Without persuasive evidence regarding the cause of the discrepancy, the law governing recounts must guide our analysis. *See* 21–A M.R.S. § 737–A; 8A C.M.R. 29 250 501–1 to –3 (1999); Me. Sec'y of State, Uniform Guidelines for Determining Voter Intent (Sept. 2007). The very purpose of the recount process is to resolve discrepancies and identify factual disputes on the paper ballots. When the recount process has occurred as set forth by the Maine Legislature, and when, aside from a discrepancy with the machine tally, there is no evidence of error or misdeed in the recount, we must rely on the final vote count from that recount in making final determinations.

[¶ 27] Here, the official recount process was carried out, and that recount resulted in a total vote count of 969 votes for the two candidates. In these circumstances, we rely on the application of the election statutes and the Secretary of State's statutorily authorized rules and guidelines to determine the outcome of the election. Absent persuasive evidence of misdeed or error during the recount process, including, for example, a violation of the applica-

ble statutes, rules, or guidelines, we rely on the results of that recount, as augmented by our inclusion of the three disputed ballots in the vote tally, to determine that Innes has prevailed in this election by one vote.

C. Outcome of the Election

[¶ 28] Because we have determined that (A) the votes cast on all three of the disputed ballots in the House District 107 Democratic primary race must be counted and (B) on this record, McLaughlin is not entitled to an additional vote based on the electronic tabulating machines' tally, we arrive at a final vote count of 485 votes for Innes and 484 votes for McLaughlin.

[¶ 29] Melissa Walsh Innes is the winner of the 2008 Democratic primary for House District 107.

[¶ 30] The decision in SJC Docket No. 243 shall, in accordance with 21–A M.R.S. § 737–A(10), be certified to the Governor by the Chief Justice.

---

7. Although Professor Douglas W. Jones testified generally that voting machines similar to those used in the House District 107 primary election are intended and expected to be reliable, he did not have information regarding which machines were employed on the day of the election; whether those machines were properly serviced; how recently maintenance had been performed on the machines; whether a paper jam occurred at any time on election day; or what software changes, if any, were made to the machines after purchase.